**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC GULF SHIPPING CO.;
MICHAEL ELSE & COMPANY LTD.,
   *Plaintiffs-Appellants,*

v.

VIGOROUS SHIPPING & TRADING
S.A.; BLUE WALL SHIPPING LTD.,
   *Defendants-Appellees,*

and

ADAMASTOS SHIPPING & TRADING
S.A.; PHOENIX SHIPPING & TRADING
S.A.; THALASSA HOLDINGS S.A.;
ALASTOR MARINE S.A.; GEORGE
GOURDOMICHALIS; EFSTATHIOS
GOURDOMICHALIS,
   *Defendants.*

No. 20-35159

D.C. No.
3:18-cv-02076-
MO

OPINION

Appeal from the U.S. District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Submitted March 5, 2021[*]
Portland, Oregon

Filed March 29, 2021

Before: Danny J. Boggs,[**] Richard A. Paez, and
Paul J. Watford, Circuit Judges.

Opinion by Judge Boggs

---

[*] The panel unanimously concludes that this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Danny J. Boggs, Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[***]

## Admiralty

The panel affirmed the district court's partial dismissal and partial summary judgment in favor of the defendants in an admiralty action alleging successor and alter-ego liability.

Pacific Gulf Shipping Co., in possession of an arbitral award against Adamastos Shipping, sought to collect from Vigorous Shipping & Trading S.A. and Blue Wall Shipping Ltd. on the grounds that they were either successors or alter-egos of Adamastos. The district court dismissed the successor-liability claim and granted summary judgment to Vigorous and Blue Wall on the alter-ego claim.

The panel held that Pacific Gulf had Article III standing because, even if Adamastos ultimately owed Pacific Gulf no damages, Pacific Gulf at least suffered a concrete, particularized injury in arbitration costs.

The panel affirmed the district court's dismissal for failure to state a claim of Pacific Gulf's claim based on successor liability. Applying federal common law, and joining other circuits, the panel held that maritime law requires a transfer of all or substantially all of the predecessor's assets to the alleged successor before successor liability will be imposed on that alleged successor.

Affirming the district court's summary judgment in favor of the defendants on the alter-ego claim, the panel held

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that to pierce the corporate veil, a party must show that (1) the controlling corporate entity exercises total dominion of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own; (2) injustice will result from recognizing the subservient entity as a separate entity; and (3) the controlling entity had a fraudulent intent or an intent to circumvent statutory or contractual obligations. Indicia used to determine whether to pierce the corporate veil include (1) disregarding corporate formalities such as, for example, in issuing stock, electing directors, or keeping corporate records; (2) capitalization that is inadequate to ensure that the business can meet its obligations; (3) putting funds into or taking them out of the corporation for personal, not corporate, purposes; (4) overlap in ownership, directors, officers, and personnel; (5) shared office space, address, or contact information; (6) lack of discretion by the allegedly subservient entity; (7) dealings not at arms-length between the related entities; (8) the holding out by one entity that it is responsible for the debts of another entity; and (9) the use of one entity's property by another entity as its own. Viewing the record as a whole, the panel agreed with the district court that there was insufficient evidence to support a finding that either Blue Wall or Vigorous was operated as an alter-ego of Adamastos.

**COUNSEL**

George M. Chalos and Briton P. Sparkman, Chalos & Co. P.C., Oyster Bay, New York, for Plaintiffs-Appellants.

Keith B. Letourneau and Zachary R. Cain, Blank Rome LLP, Houston, Texas; M. Christie Helmer and Ian M. Christy, Miller Nash Graham & Dunn LLP, Portland, Oregon; for Defendant-Appellee Vigorous Shipping & Trading S.A.

Bruce G. Paulsen and Brian P. Maloney, Seward & Kissel LLP, New York, New York; Michael E. Haglund and Eric J. Brickenstein, Haglund Kelley LLP, Portland, Oregon; for Defendant-Appellee Blue Wall Shipping Ltd.

---

**OPINION**

BOGGS, Circuit Judge:

In this admiralty case, appellant Pacific Gulf, in possession of an arbitral award against Adamastos Shipping, tried to collect from appellees Blue Wall and Vigorous Shipping on the grounds that they are either successors to or alter-egos of Adamastos. The district court dismissed the successor-liability claim and granted summary judgment to Blue Wall and Vigorous on the alter-ego claim. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

Brothers George and Efstathios Gourdomichalis operate cargo vessels through their company Phoenix Shipping. Pacific Gulf chartered the M/V *Adamastos*, operated by

Phoenix, from Adamastos,[1] in which the brothers were also officers. Another company, Intergis, subchartered the *Adamastos* from Pacific Gulf. Yet another company, Marubeni, further subchartered her from Intergis to transport soybeans to China.

But the *Adamastos* had a number of problems. Port inspectors at São Francisco, Brazil, found more than 40 defects on the vessel, and, while in port, she broke free of her moorings and ran aground. Phoenix canceled the insurance on the *Adamastos* and abandoned her and her cargo in Brazil. Liability traveled up the charterparty chain, and Pacific Gulf—or, rather, its insurer and subrogee, Michael Else & Co. ("MECO")—was left holding the bag. Pacific Gulf brought arbitration proceedings in England and won an award after Adamastos failed to respond.

The Gourdomichalis brothers were also shareholders, directors, and officers at Blue Wall, whose fleet of eight cargo vessels Phoenix also operated. One of those vessels was the M/V *Vigorous*, which Blue Wall held indirectly through its wholly owned subsidiary Vigorous. Pacific Gulf, unable to collect from the severely undercapitalized Adamastos, instead sought to enforce its award against Blue Wall and Vigorous on the grounds that the brothers dominate and control Blue Wall and Vigorous as part of a single enterprise that includes Adamastos.[2]

---

[1] The vessels in this case are each owned by a corporation sharing its name with the vessel. To distinguish them, we italicize references to the vessels and refer to the corporations in roman type.

[2] We note that this particular suit isn't Pacific Gulf's first broadside against the appellees. In 2015, it had the *Vigorous* arrested in South Africa, whose courts dismissed Pacific Gulf's allegations as groundless.

In 2018, Pacific Gulf attached the *Vigorous* while she was in port on the Oregon side of the Columbia River. Posting $9.5 million security for the release of the *Vigorous*, the appellees moved to dismiss the verified complaint—as well as its first, second, and third amendments. The district court let the case proceed to discovery, in which well over 100,000 pages of documents were disclosed and at least a dozen depositions taken.

In January 2020, the district court disposed of the case in favor of the appellees. After oral argument, it first dismissed Pacific Gulf's claim based on successor liability. After additional argument two weeks later, the court granted summary judgment to Blue Wall and Vigorous, observing that Pacific Gulf had "come back largely empty handed" from its extensive discovery expedition.

This timely appeal follows.

## II

Besides arguing for affirmance, Blue Wall and Vigorous raise a jurisdictional challenge: that Pacific Gulf lacks Article III standing because it did not suffer an injury. A federal court must satisfy itself of its jurisdiction to hear a case, *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705 n.2 (9th Cir. 2020), so we briefly address the appellees' challenge.

According to the appellees, MECO satisfied Pacific Gulf's liability by exchanging internal credit and debit notes on its books (Intergis, the company that had subchartered the *Adamastos* from Pacific Gulf, was also insured by MECO).

---

Pacific Gulf also attached another of Blue Wall's fleet, the M/V *Fearless*, in the Southern District of Texas. The resulting litigation is still ongoing there.

So Pacific Gulf never paid any cash to Intergis for its liabilities from the *Adamastos* incident. And Pacific Gulf has since withdrawn from the insurance pool, so it will not pay higher premiums. Thus, the appellees say, there is no concrete injury to Pacific Gulf. And because MECO is Pacific Gulf's subrogee, it could only recover what Pacific Gulf could—which is nothing. Furthermore, MECO cannot recover the payments it made to settle Marubeni's claims against Intergis because Intergis was never in privity with Adamastos.

But Pacific Gulf's arbitral award refutes the appellees' basic premise. Even if Adamastos ultimately owes Pacific Gulf no damages, Pacific Gulf is still out at least £5,530 in arbitration costs—plus interest. Peanuts, maybe, compared to the $18.5 million relief at stake, but a concrete, particularized injury nonetheless. *See Uzuegbunam v. Preczewski*, No. 19-968, slip op. at 9 (U.S. Mar. 8, 2021) ("Despite being small, nominal damages are certainly concrete.").

Because Pacific Gulf has standing, we need not determine whether MECO separately has standing. *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932–33 (9th Cir. 2008).

## III

We now consider Pacific Gulf's claim based on successor liability.[3] We review de novo a dismissal for failure to state a claim. *Knievel v. ESPN*, 393 F.3d 1068,

---

[3] Going forward, we refer to the appellants collectively as "Pacific Gulf" because MECO maintains the same position as Pacific Gulf and there is no practical reason to consider them separately.

1072 (9th Cir. 2005). We "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Ibid.* But conclusory legal allegations are "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rather, legal conclusions "must be supported by factual allegations." *Ibid.*

Sitting in admiralty, we apply the federal common law in examining corporate identity. *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997).

Transfer of all or substantially all a corporation's assets is a prerequisite to a finding of successor liability. The First Circuit observed in *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1448 (1st Cir. 1995), that "successor liability in general, and the 'mere continuation' and 'de facto merger' exceptions in particular, are always discussed and analyzed in the context of inter-corporate asset transfers." Pacific Gulf asserts that "the theory of successor liability recovery is not so narrow" as to require asset transfer as an element, but it cites no legal support for that proposition. Indeed, the First Circuit found only three decisions in which "a litigant sought to impose successor liability in the absence of an asset transfer," all three of which held that "asset transfer was an essential prerequisite to successor liability." *Ibid.* And in our own research of post-*Carreiro* decisions, we have found several cases in accord and none in disagreement. *See, e.g.*, *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) (applying state law); *Per-Co, Ltd. v. Great Lakes Factors*, 299 F. App'x 559, 562 (6th Cir. 2008) (applying Ohio law); *Premier Cap., LLC v. KMZ, Inc.*, 984 N.E.2d 286, 292–93 (Mass. 2013). We join these courts in holding that maritime law too requires a transfer of all or substantially all of the predecessor's assets to the

alleged successor before successor liability will be imposed on that alleged successor.

Pacific Gulf has failed to plead that essential fact. Pacific Gulf made only a conclusory allegation that Blue Wall and its subsidiaries "comprise successor corporate business entities of" Adamastos. It alleged no transfer of any assets (let alone all or substantially all) from Adamastos to Blue Wall or its subsidiaries. Because Pacific Gulf failed to plead a factual prerequisite to corporate successorship, the district court correctly dismissed the claim based on that theory.

IV

We also agree with the district court that Pacific Gulf's discovery revealed nothing to allow a reasonable juror to rule in its favor on the alter-ego theory.

A

We review de novo a grant of summary judgment. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). If the nonmovant bears the burden of persuasion on the ultimate issue, the movant may make its required initial showing that there is no genuine dispute of material fact, Fed. R. Civ. P. 56(c)(1)(A), by demonstrating that "there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The burden of production then shifts to the nonmovant, who must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting former Fed. R. Civ. P. 56(e) (1963)). The nonmovant's burden of production at this point "is not a light one"—it "must show

more than the mere existence of a scintilla of evidence" or "some 'metaphysical doubt' as to the material facts at issue." *Oracle Sec. Litig.*, 627 F.3d at 387 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). It "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor," assuming that "all justifiable inferences are . . . drawn in its favor." *Ibid.*

## B

To pierce the corporate veil, a party must show that (1) "the controlling corporate entity exercise[s] total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own," *Chan*, 123 F.3d at 1294 (quoting *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 859 (9th Cir. 1986)), (2) "injustice will result from recognizing [the subservient entity] as a separate entity," *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1489 (9th Cir. 1983), and (3) the controlling entity "had a fraudulent intent or an intent to circumvent statutory or contractual obligations," *ibid.* Whether these elements are established is a fact-intensive inquiry, requiring the court to consider the totality of the record and circumstances. *See Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1112–13 (9th Cir. 1979) (thoroughly examining the record to review the district court's decision not to pierce the corporate veil).

A review of the case law and scholarly literature reveals a number of indicia that courts have used to determine whether to pierce the corporate veil. *See generally Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal. Rptr. 806, 813–15 (Ct. App. 1962); David H. Barber, *Piercing the Corporate Veil*,

17 Willamette L. Rev. 371, 372–75 (1981). These indicia include (1) disregarding corporate formalities such as, for example, in issuing stock, electing directors, or keeping corporate records; (2) capitalization that is inadequate to ensure that the business can meet its obligations; (3) putting funds into or taking them out of the corporation for personal, not corporate, purposes; (4) overlap in ownership, directors, officers, and personnel; (5) shared office space, address, or contact information; (6) lack of discretion by the allegedly subservient entity; (7) dealings not at arms-length between the related entities; (8) the holding out by one entity that it is responsible for the debts of another entity; and (9) the use of one entity's property by another entity as its own. *See Seymour*, 605 F.2d at 1110 n.4; *Wm. Passalacqua*, 933 F.2d at 139. This list is, of course, nonexhaustive.

But the mere presence of some of these indicia is not dispositive, nor is it necessarily enough to survive summary judgment. For example, we held in *Chan* that, without more, a single person's common ownership of three corporations was insufficient to prove at trial that the corporations were alter-egos. 123 F.3d at 1294. The Fifth Circuit has held that indirect ownership of all of a corporation's stock, a "number of common officers and directors," and "substantial control" over an alleged subservient corporation's "general policy decisions" were insufficient to "establish a prima facie showing of alter ego" because the entities also observed corporate formalities and there was "no more [control] than appropriate for a wholly-owned subsidiary." *Adm'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 330–31 (5th Cir. 2011). Courts have also found that "superficial indicia of interrelatedness" such as shared office space and phone numbers are "not dispositive of the [alter-ego] question," instead looking to a corporation's "practical operation" as "more instructive." *E.g.*, *Coastal States*

*Trading, Inc. v. Zenith Navigation, S.A.*, 446 F. Supp. 330, 334 (S.D.N.Y. 1977).

C

Pacific Gulf argues that the district court erred by focusing on whether it had presented enough evidence to dispute Blue Wall's "corporate legitimacy." Pacific Gulf cites our invocation in *Chan* of *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980), to claim that corporate legitimacy is not a factor considered in the veil-piercing analysis. Rather, Pacific Gulf claims that the applicable standard is whether it has identified a genuine issue of material fact about "whether the corporate form of the Defendants Blue Wall and Vigorous Shipping was being dominated and controlled by Defendants George and Efstathios Gourdomichalis (and Phoenix Shipping)." Appellants' Br. 19.

Pacific Gulf is wrong in two respects. First, by focusing on isolated language in *Chan*, it misses the other two parts of the inquiry: injustice from failing to pierce the veil and ill intent on the part of the dominating entity. It is true that the Second Circuit employs a disjunctive rule allowing a plaintiff to pierce the corporate veil with only a showing of *either* domination and control *or* fraud. *Kirno Hill*, 618 F.2d at 985; *see also N. Tankers (Cyprus) Ltd. v. Backstrom*, 967 F. Supp. 1391, 1398–401 (D. Conn. 1997) (reconciling the Second Circuit's case law on the point). But, as we stated in *American Queen*, the Ninth Circuit has a conjunctive test: there must be domination and control *and* injustice from not piercing the veil *and* some form of ill intent. 708 F.2d at 1489–90; *see also Seymour*, 605 F.2d at 1109–13 (first articulating the three requirements to pierce the corporate veil in the context of a labor dispute and applying them conjunctively). So *Chan* did not remove the bad-intent

requirement—nor could it have, for a published panel decision may only be displaced by the en banc court or the Supreme Court. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1284 (9th Cir. 2020). We merely held in *Chan* that the plaintiff there had shown neither domination and control nor fraud and therefore could not pierce the veil. 123 F.3d at 1294. Our reference to the Second Circuit's case law had no precedential effect.

Second, even though Blue Wall's corporate legitimacy is not itself an element of the alter-ego inquiry, the district court was correct to consider it. Evidence of illegitimacy may create a genuine dispute of material fact about the intent of an allegedly dominating entity. On the other hand, if the only evidence produced is consistent with the behavior of the vast number of legitimately operated businesses, an inference of ill intent is not reasonable. *Cf. Matsushita*, 475 U.S. at 588 (holding that, on summary judgment, antitrust plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" them).

D

Pacific Gulf's claim is that the Gourdomichalises dominated and controlled Blue Wall, Vigorous, and Adamastos as parts of a single enterprise, so that all of them should be treated as one. Therefore, for its award against Adamastos to be enforceable against the appellees, Pacific Gulf must show *at least* that the brothers dominated and controlled either Blue Wall or Vigorous and used it for a fraudulent purpose. *Am. Queen*, 708 F.2d at 1490. The appellees met their initial burden of production by pointing out the absence of evidence in the record demonstrating either that the Gourdomichalis brothers dominate and

control the appellees or that the appellees were operated with fraudulent intent. Thus, Pacific Gulf had the burden of producing enough evidence to satisfy a reasonable juror that those two propositions are true. *Celotex*, 477 U.S. at 324.

But much of the evidence Pacific Gulf cites has no connection to Blue Wall or Vigorous at all. That evidence is instead more relevant to the brothers' connection to Adamastos or Phoenix, which even the district court assumed for the purpose of summary judgment.

Stripped to its relevant essentials, Pacific Gulf's resulting argument is that, because Blue Wall's other directors and shareholders exercised little oversight over the brothers' management of the company's fleet and bank accounts, the brothers dominated and controlled Blue Wall and its subsidiaries, including Vigorous.

There are two problems with that argument. First, Pacific Gulf's evidence does not reasonably support the strong inferences it draws. It frequently extrapolates from the ignorance of a sole director on some point to the ignorance of Blue Wall's entire board.

Second, even assuming that Blue Wall's board and owners were completely ignorant of the shipping business and left all the management and operation decisions to the Gourdomichalises, there is not enough to show the required element of fraud. As Pacific Gulf's counsel conceded at oral argument in the district court, it is not "suspicious and uncommon" that the "board of directors [is not] involved in the banking activity and the day-to-day operations of the business." Investors often do not care about the details of business—they just invest their money with purported experts and expect a good return. Mere evidence of common,

legitimate business conduct is not enough for a reasonable inference of fraud.

Pacific Gulf tries to bolster its argument by pointing to overlaps among the businesses. Of course, it is undisputed that the operations of Blue Wall, Vigorous, and Adamastos all involve the Gourdomichalis brothers. Nor is it disputed that Adamastos, Phoenix, and Vigorous all shared the same office or that Blue Wall and Phoenix had the same contact information. But these facts, absent any evidence suggesting wrongdoing, do not reasonably justify a finding of alter-ego. *See Chan*, 123 F.3d at 1294; *Tulane Educ. Fund*, 450 F. App'x at 330–31; *Coastal States*, 446 F. Supp. at 334.

Moreover, Pacific Gulf fails to dispute the evidence presented by Blue Wall and Vigorous, which included a report by an auditor finding no financial mismanagement among Blue Wall, its subsidiaries, Phoenix, and Adamastos. The auditor found no intermingling of funds and no raiding of bank accounts. Even the few potential irregularities that Pacific Gulf points to in Vigorous's bank statements (three payments to Giorgio Armani) were identified as payments on behalf of the master of the *Vigorous*, whose salary was reduced by those same amounts. Pacific Gulf points to no specific evidence disputing the probity of Blue Wall and Vigorous's books, so we deem that fact undisputed. Fed. R. Civ. P. 56(e)(2)–(3).[4]

Viewing the record as a whole, we agree with the district court that Pacific Gulf came away "empty handed" from

---

[4] Pacific Gulf also points to apparent payments for personal goods and services in Phoenix's bank statements. But those payments too were accounted for by the auditor's report, making it unreasonable to infer that the Gourdomichalis brothers were moving funds illicitly to Phoenix's accounts for their own personal use.

discovery. There is insufficient evidence to support a finding that the Gourdomichalis brothers operated either Blue Wall or Vigorous as an alter-ego of Adamastos, even after drawing all reasonable inferences in favor of Pacific Gulf.

**AFFIRMED.**